UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| EDWARD EUGENE YOUNG<br><br>Plaintiff<br>v.<br><br>A.T. WALL, in his capacity as the Director of the Rhode Island Department of Corrections<br><br>Defendant | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | C.A. No. 03-220S |

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Edward Young, hereby moves for summary judgment pursuant to Rule 56(a) and (c) in Counts I and 2 of Plaintiff's Second Amended Complaint.

In support of his motion, Plaintiff submits herewith (1) Plaintiff's Memorandum In Support of Motion For Summary Judgment and (2) the parties' Joint Statement of Facts.

EDWARD EUGENE YOUNG

By His Attorneys,

Andrew B. Prescott (#3758)
Stacie Boeniger Collier (#6059)
NIXON PEABODY, LLP
One Citizens Plaza, Suite 500
Providence, RI 02903
401-454-1000
401-454-1030 (Fax)

Date: September 8, 2005

## CERTIFICATION

I hereby certify that a copy of the within Plaintiff's Motion for Summary Judgment was sent by first class mail to Thomas A. Palombo, Esq., Assistant Attorney General, Department of the Attorney General, 150 South Main Street, Providence, RI 02903 on the 9th day of September, 2005.

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| EDWARD EUGENE YOUNG | : | |
| | : | |
| Plaintiff | : | |
| v. | : | C.A. No. 03-220S |
| | : | |
| A.T. WALL, in his capacity as the Director of the Rhode Island Department of Corrections | : | |
| | : | |
| Defendant | : | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

The Defendant has violated the Plaintiff's constitutional rights in at least two ways. By keeping for the Rhode Island Department of Corrections ("RIDOC") interest generated by Plaintiff's money on deposit with the RIDOC, the Defendant violated the Plaintiff's rights under the takings clause of the Fifth Amendment to the United State Constitution and § 16 of Article I of the Rhode Island Constitution. By promulgating the policy by which RIDOC began to keep Plaintiff's interest and by taking the interest without affording the Plaintiff a sufficiently meaningful notice and opportunity to be heard, the Defendant violated the Plaintiff's right to procedural due process.

Plaintiff seeks summary judgment finding that the RIDOC overstepped constitutional bounds. The right of an inmate to interest on money he earned while in prison may not strike the Court as involving a constitutional question of great moment. But there are no insignificant constitutional rights. The Plaintiff, although in prison, has as much entitlement to constitutional protection as citizens of Rhode Island living outside the walls of the ACI.

## II. TRAVEL OF CASE

Plaintiff filed this civil action *pro se* on or about June 4, 2003. His *pro se* complaint included myriad claims. On or about August 20, 2003, Plaintiff filed *pro se* an Amended Complaint. On or about December 26, 2003, Plaintiff, on behalf of himself and other similarly situated inmates, filed a motion for determination as class pursuant to Fed. R. Civ. P. 23. Defendant filed a motion to dismiss.[1]

On March 5, 2005, this Court issued a Decision and Order dismissing all of Plaintiff's claims save one. This Court held that "a prisoner does not maintain a constitutionally-protected right in the interest accrued from wages for paid labor" and that therefore "the appropriation of [Plaintiff's] interest earned on wages from paid labor cannot be a taking in violation of the Fifth Amendment of the United States Constitution." Young v. Wall, 359 F. Supp. 2d 84, 86 (D. R.I. 2005). This Court also held that Plaintiff "has a limited property right in such interest which cannot be withdrawn without affording him procedural due process under the Fourteenth Amendment." Id. at 94.

On May 3, 2005, the District Court denied Plaintiff's motion for class certification. On June 1, 2005, Plaintiff filed a Second Amended Complaint including only claims under the Rhode Island and United States Constitutions relating to the interest issue. On June 17, 2005, Defendant filed a motion to certify a question to the Rhode Island Supreme Court. Specifically, Defendant asked the Supreme Court to decide whether "the State of Rhode Island [was] required to pay interest on funds in inmate accounts maintained pursuant to General Laws of Rhode Island § 42-56-22." On July 14, 2005, this Court denied Defendant's motion to certify the question before the Rhode Island Supreme Court.

---

[1] After the motion to dismiss had been ruled on by a report and recommendation by Magistrate Judge Jacob Hagopian, Nixon Peabody LLP and Andrew B. Prescott entered his appearance for the Plaintiff on or about April 4, 2004.

## III. FACTS

The parties have provided a Joint Statement of Facts and set forth the undisputed facts therein.

## IV. ARGUMENT

### A. The Absence Of Any Genuine Issues Of Material Fact Qualifies This Case For Resolution By Summary Judgment.

Pursuant to Rule 56(a) and (c), this Court should issue summary judgment in favor of the Plaintiff if the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits, if any, show that there is no genuine issue as to any material fact and that the [Plaintiff] is entitled to a judgment as a matter of law." Rule 56(c) provides that "[a] summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages."[2] The issues regarding liability can be adjudicated on summary judgment because both Plaintiff and Defendant have agreed that there are no genuine issues of material fact.

### B. Defendant Violated Plaintiff's Rights Under The United States and Rhode Island Constitutions Not To Be Deprived Of His Property Without Just Compensation.

#### 1. The takings clause

In Pascoag Reservoir & Dam, LLC v. The State of Rhode Island, the court set forth the basic takings clause concepts as follows:

> The Fifth Amendment of the Constitution states that "private property shall not be taken for public use, without just compensation." U.S. Const. Amend. V. The Fifth Amendment applies to the Federal Government. . . . [T]he Takings Clause of the Fifth Amendment has been incorporated into the Fourteenth Amendment. Chicago, B&O R.R. Co. v. City of Chicago, 166 U.S. 226, 241, 41 L.Ed. 979, 17 S. Ct. 581 (1987). Therefore, the Takings Clause via incorporation applies to the states. See id.

[2] Plaintiff seeks summary judgment in his favor on the issue of liability and stands ready to prove damages thereafter.

217 F. Supp. 2d 206, 217 (D. R.I. 2002).

The Rhode Island Constitution provides the same protection to private property. Section 16 of Article I of the Rhode Island Constitution declares as follows: "Private property shall not be taken for public uses, without just compensation."

2. Plaintiff's common law property interests

Plaintiff is in prison but he retains a wide array of constitutional and other legal rights.

> Lawful imprisonment necessarily makes unavailable many rights and privileges of the ordinary citizen, a "retraction justified by the considerations underlying our penal system." Price v. Johnston, 334 U.S. 266, 285 (1958). But though his rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections when he is imprisoned for a crime. There is no iron curtain drawn between the Constitution and the prisons of this country. Prisoners have been held to enjoy substantial religious freedom under the First and Fourteenth Amendments. Cruz v. Beto, 405 U.S. 319 (1972); Cooper v. Pate, 378 U.S. 546 (1964). They retain right of access to the courts. Younger v. Gilmore, 404 U.S. 15 (1971), aff'g Gilmore v. Lynch, 319 F. Supp. 105 (N.D. Cal. 1970); Johnson v. Avery, 393 U.S. 483 (1969); Ex Parte Hull, 312 U.S. 546 (1941). Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment from invidious discrimination based on race. Lee v. Washington, 390 U.S. 333 (1968). Prisoners may also claim that protections of the Due Process Clause. They may not be deprived of life, liberty, or property without due process of law. Hanes v. Kerner, 404 U.S. 519 (1972); Wilwording v. Swenson, 404 U.S. 249 (1971); Screws v. United States, 325 U.S. 91 (1945).

Wolff v. McDonnell, 418 U.S. 539, 555-556 (1974).[3]

[3] The Supreme Court of Rhode Island has also emphasized inmates' retention of substantial rights by extending to inmates fourth amendment protection against unreasonable searches. See State v. Wilmot, 461 A.2d 401, 405-407 (1983) (rejecting the state contention that an inmate has no standing to object to a search of his cell and finding that the inmate had a court legitimate, though diminished, expectation of privacy in his cell.)

In this takings case, the question involves Plaintiff's property rights. This Court must look first to Rhode Island law, including of course the State's own common law,[4] to determine the nature and extent of Plaintiff's property interest in money paid to him for his work while in prison at the ACI. See Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 161 (1980); Picard v. Members of the Employee Retirement Board of Providence, 275 F.3d 139, 144 (1st Cir. 2001) ("In evaluating whether a purported property right is entitled to constitutional protection under the Takings Clause . . . , this Court generally looks to state law as interpreted by the State's highest court.") In his money, and the interest generated by it, Plaintiff unquestionably has a substantial enough interest to warrant protection under the Takings Clause.

Rhode Island law requires the conclusion that Plaintiff has the requisite interest in his in-prison earnings. The analysis begins with the unsurprising precept that Rhode Island citizens have a property interest in their money. See, e.g., In re James C., 871 A.2d 940, 942 (2005). Accordingly, unless Plaintiff's incarceration dramatically diminishes his fundamental property interest in money he earns, he has a "full" and not a "limited" property interest in his wages.

Nothing in the common law of Rhode Island suggests that the Plaintiff forfeited the bulk of his constitutionally cognizable property rights when he went to jail. To the contrary, the Rhode Island common law recognizes prisoners' property rights. In Anderson v. Salant, the Supreme Court of Rhode Island noted that the "rights of a prisoner in Rhode Island are far wider than those of a slave" and pointed specifically to the fact that "a convict can have an interest in property while a slave can not." 38 R.I. 463, 96 A. 425, 474-475 (1916) (emphasis added).

Plaintiff's earnings may not be exactly like money earned by other citizens, but any differences fall short of a legally meaningful distinction. In particular, the fact that the RIDOC

4 This Court cannot "revisit" decisions of the Rhode Island Supreme Court regarding "an issue of state law." Pascoag Reservoir & Dam, LLC v. The State of Rhode Island, 217 F. Supp. 2d 206, 212-213 (D. R.I. 2002).

could have chosen not to pay Plaintiff for his work logically makes no difference. Employers often make "gratuitious" payments to employees in the form of bonuses or monetary gifts. One would never even suggest that the employee who receives such a gratuitous payment from his employer lacks a constitutionally protectable property interest in the payment once received. Likewise, the fact that the RIDOC initially exercised its discretion and decided to pay Plaintiff for his labor should make no difference here.[5] While an employer has a legal obligation to pay for labor and the RIDOC does not, it is insufficient to announce that constitutional property rights do not exist merely because the circumstances under which the property (i.e., the money) was obtained differ.

This Court should not mimic the rather casual dismissal of inmates' common law property rights by the Eleventh Circuit Court of Appeals in Givens v. Alabama Dept. Of Corrections, 381 F.3d 1064 (11th Cir. 2004), cert. denied, 125 S. Ct. 2543 (U.S. 2005) and the Fourth Circuit Court of Appeals in Washlefske v. Winston, 234 F.3d 179 (4th Cir. 2000) , cert. denied, 532 U.S. 983 (2001). The courts in these cases concluded that unlike private citizens who have a constitutionally protected property interest in wages earned from their labor, inmates do not.[6] In Washlefske, 234 F.3d at 184-185; Givens, 381 F.3d at 1068-1069. The courts relied on broad declarations regarding the right to force inmates to work without pay and inmates forfeiture of inmates' personal property rights. Id.

---

5 RIDOC clearly created an expectation and understanding in Plaintiff that he would be paid for his labor by having a practice and policy of paying. The common "understanding" that all citizens have when paid for their labor is that the money paid has become their property. This understanding is relevant to the assessment of the pivotal property right question. See Webb's, 449 U.S. at 161.

6 In Schneider v. California Dept. of Corrections, 151 F.3d 1194, 1201 (9th Cir. 1998), the Ninth Circuit Court of Appeals decided that the trial court had erred by concluding that "'inmates in California do not have a protected property interest in the interest earned on [inmate trust accounts].'" The Court in Schneider concluded implicitly that the money deposited into the accounts by the inmates represented property under "traditional" or "old property rights" even though the relevant California statute denied the existence of a property right in the interest on the inmates' money. Id. at 1199-1201. The Eleventh Circuit's opinion in Schneider lacked full elucidation but reached the right result.

At least two compelling reasons exist to reject the Givens and Washlefske rationale. First, to the extent that both cases rely significantly on the ability of the state (i.e., the prison system) not to pay inmates for their labor in the first instance, the reasoning is seriously flawed. The question should be whether the state having decided to pay the inmate for labor, can trample the property rights that every citizen enjoys once paid for his or her labor. Second, it appears that the common law of Alabama and Virginia provided no basis to depart from centuries old English common law declarations regarding prisoners' absolute lack of property rights. Rhode Island law does provide such a basis.

In Rhode Island, prisoners' property rights have been recognized. The Rhode Island Supreme Court's pronouncement that "[a] convict is neither civilly dead, nor deprived of his rights of property" and that "a convict can have an interest in property" leaves no doubt that prisoners in Rhode Island have property rights . . . ." Anderson, 96 A. at 475. More recently, in Rhode Island Council 94 v. State of Rhode Island, the Supreme Court properly characterized the money it paid to prison inmates as "wages." 714 A.2d 584, 592 (1998) ("The wages received by prison inmates ($3 per day) are significantly less than the compensation paid to regular state employees.") (emphasis added). In short, Rhode Island's common law has evolved beyond the English common law and such evolution significantly alters the analysis.

3. Plaintiff's statutorily created property interest

Section 42-56-22 of the Rhode Island General Laws mandates that funds in the inmates' frozen account be turned over to the inmate at the time of release. The General Assembly unequivocally characterized the money in the frozen account as inmates' property as follows: "[T]hose funds to be turned over to the prisoner at the time of his or her release from the institution, the funds being his or her property. . . ." (Emphasis added). Neither the Virginia

nor the Alabama statutes in Washlefske and Givens included such unequivocal labeling of the inmates' funds as the inmates' property.[7]

Washlefske and Givens incorrectly conclude that the restrictions on an inmates' right to spend and possess his earnings while incarcerated precludes the prisoners from garnering a constitutionally protected property interest in the monies. Givens, 381 F.3d at 1069; Washlefske, 234 F.3d at 185. In doing so, the courts distinguished Phillips v. Washington Legal Foundation, 524 U.S. 156 (1998) and Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155 (1980) in which the United States Supreme Court ruled that a constitutionally protected stake in principal sums of money attach to the interest generated on that money under the interest follows principal rule. Washlefske, 234 F.3d at 185-186; Givens, 381 F.3d at 1069.

The Givens and Washlefske decisions correctly note differences between inmate funds and non-inmate funds. But the decisions incorrectly conclude that the limitations on prisoners' use of their money means that they have no protectable constitutional property interest in the funds. The courts, however, have recognized constitutionally protected property interests in all types of property owned under various forms of substantial restriction. For example, under the zoning and housing laws, the owner of a house in a residential zone cannot manufacture commercial goods in the house or lease all of the rooms in the house out to different families. Yet the government cannot take the home without paying just compensation. An owner of a certificate of deposit, an IRA, or certain investment bonds cannot receive payment for the amount invested prior to the expiration of the term of the investment vehicle or some time set by law without significant penalties. Yet the government cannot take the principal or return on deposit without just compensation. A car owner must operate it only in accordance with traffic

[7] In Givens, the Eleventh Circuit quoted Alabama Code § 14-8-6 as stating, in part, "[u]pon his or her release all moneys being held by the department shall be paid over to the inmate."

laws, register it, and have it inspected. But the owner still has a constitutionally protectable property interest in the car.

Indeed, the United Supreme Court in Webb's rejected the concept relied upon by the Washlefske and Givens courts that inability to immediately use and enjoy funds extinguishes the property interest. In Webb's, the "creditor claimants" had no "right to the deposited fund until their claims were recognized and distribution was ordered." Webb's, 449 U.S. at 161-162. The Court declared that the "lack of immediate right, however, does not automatically bar a claimant ultimately determined to be entitled to all or a share of the fund from claiming a proper share of the interest, the fruit of the fund's use, that is realized in the interim." Id. at 162.

The RIDOC has restricted the Plaintiff's ability to use and spend the money that he has earned and deposited in his inmate accounts. Joint Statement of Facts ("JSF") at ¶ 6. Yet the Plaintiff retains under that statutory and regulatory scheme substantial property rights. Using the money in his open account, he can purchase goods from the prison commissary and therefore turn his earnings into consumable goods just like other citizens do. JSF at ¶ 9. Or he can choose not to spend the money in the account and save it for the time of his release (after which he would be more or less free to spend the money in any way that he pleases).[8] Section 42-56-22(b) makes it clear that the Plaintiff has the right to use his funds "in the account for the payment of any court fees and court costs required to be paid for the filing, prosecution and defense of any action."

For the above reasons, Plaintiff urges this Court to join with the Ninth Circuit Court of Appeals in upholding an inmate's right to interest on money in a prison account. Plaintiff earned the money by working and like every other Rhode Island citizen enjoys a constitutional right to

---

8 Plaintiff assumes that inmates released early on probation are restricted from buying otherwise legal goods (e.g., firearms or certain legal drugs). But the existence of such restrictions certainly do not obviate the constitutionally protectable property interest that they have in their money after release.

both the money he was paid for his work and the interest earned thereon. It is the fair and constitutionally required result.

C. The Defendant Has Deprived The Plaintiff Of His Procedural Due Process Rights.

Even if the Court should hold that an unconstitutional taking has not occurred, the inquiry does not end there. Inherent in every state action is the requirement that citizens are afforded procedural due process in accordance with the Fourteenth Amendment. Indeed, "[t]he touchstone of due process is protection of the individual against arbitrary action of government." Wolff v. McDonnell, 418 U.S. 539, 558 (1974), quoting, Dent v. West Virginia, 129 U.S. 114, 123 (1889). It is clear that RIDOC did not afford constitutional due process within the meaning of the Fourteenth Amendment to Mr. Young.

"Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." Carey v. Piphus, 435 U.S. 247, 259 (1978). Therefore, even where the state is allowed to deprive an individual of certain property, it must still comport with the rules of procedural due process. Goldberg v. Kelly, 397 U.S. 254, 262 (1970).

Procedural due process mandates notice and an opportunity to be heard. Id. at 267. The hearing must be "'at a meaningful time' and in a meaningful manner." Id., quoting, Armstrong v. Manzo, 380 U.S. 545, 552 (1965). In this case, the state failed to provide either in advance of its decision to stop distributing interest to the Inmate Accounts Funds.

For many years, the RIDOC had in place Policy No. 2.17-1 and later, RIDOC Policy No. 2.17-2. Both provided that the return on investments earned on monies in the Inmate Accounts Fund would accrue to the inmates in an equitable fashion. JSF at ¶¶ 13-15. Pursuant to Policy No. 2.17-2, the RIDOC posted and distributed interest to the inmates' individual accounts based upon their average daily balances. JSF at ¶ 15.

When the RIDOC decided to switch vendors for its inmate accounts systems, it learned that the three respondents to its request for proposal did not currently have the capability to distribute interest earnings based on average daily balances. The RIDOC then examined whether it needed to distribute interest earnings to inmates at all. JSF at ¶ 16. It decided to use any interest earned to pay for the cost of banking and related expenses instead of continuing to distribute the interest to the inmates. JSF at ¶ 18.

The RIDOC stopped posting interest to the Inmate Accounts Funds on June 1, 2002. This change in practice occurred before the promulgation of a revised policy. JSF at ¶ 19. The inmates' earliest possible notice of this sudden policy change occurred on or about June 20, 2002 when Richard J. Frechette, Associate Director of Financial Resources, posted a notice announcing the imminent change. JSF at ¶ 19. The RIDOC then published an article on page 4 of its John J. Moran Facility – Medium Security Newsletter in July of 2002. JSF at ¶ 20. When Mr. Young read this article, he learned for the first time that he would no longer be accruing interest on his accounts. JSF at ¶ 21. On or about August 14, 2002, Mr. Frechette sent inmates who made inquiries about the issue of interest payments, including Mr. Young, a memo regarding the change of practice with respect to interest payments. JSF at ¶ 23.

RIDOC did not formally suspend the provisions of RIDOC Policy No. 2.17-2, which required that return of investment earned on monies in the Inmate Accounts Fund accrued to the depositing inmates in an equitable fashion, until August 28, 2002. JSF at ¶ 22. By memorandum dated May 6, 2003, Defendant finally repealed RIDOC Policy No. 2.17-2 and implemented in its place RIDOC Policy No. 2.17-3. RIDOC Policy No. 2.17-3 was to be effective June 9, 2003. JSF at ¶ 24. RIDOC Policy No. 2.17-3 provided that interest earned in the Inmate Accounts Fund would no longer accrue to the inmates, but instead would accrue to the State of Rhode Island. JSF at ¶ 25.

Thereafter, Mr. Young retrieved and reviewed RIDOC Policy No. 2.17-3 from the ACI's Law Library for the first time. JSF at ¶ 26. On or about February 19, 2004 and March 19, 2004, Mr. Young sent letters to Lawrence C. Franklin Jr., State Controller, requesting information on inmate account interest. JSF at ¶ 31. Mr. Franklin responded to Mr. Young's February 19, 2004 letter on or about March 18, 2004. JSF at ¶ 32.

The state's unilateral decision to stop paying interest in June of 2002 without any advance notice or hearing rights to the inmates constituted a clear violation of Mr. Young's rights under the Fourteenth Amendment. They were informed via a written posting and a newsletter article about the state's decision to stop distributing earnings to the inmate accounts in June and July of 2002 provided information about the action, but by then RIDOC had already stopped the payment of interest. While inmates, including Mr. Young, inquired about the state's decision, clearly, the damage was done as interest no longer accrued to their accounts. Thus, permitting the inmates to write letters after the fact paid lip service only to the constitutional opportunity to be heard. See e.g., Goldberg, 397 U.S. at 269 (written submission by the welfare recipient regarding the termination of welfare benefits not a realistic means of achieving due process).

By the time the RIDOC actually repealed Policy No. 2.17-2 and promulgated Policy No. 2.17-3 in June of 2003, the inmates had been deprived of their earnings for over eleven months. By that point, there admittedly been notice of the policy change, but again, not before the ongoing deprivation had begun. In addition, there had been no meaningful opportunity for Mr. Young to be heard on this policy change.

"The opportunity to be heard must be tailed to the capacities and circumstances of those who are to be heard." Id. at 268-269. In determining the constitutionally required protections in a given case, the Supreme Court weighs several factors: "First, the private interest that will be

affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Mathews v. Eldridge, 424 U.S. 319, 335 (1976).

Applying this test, "the court usually has held that the Constitution requires some kind of hearing *before* the State deprives a person of liberty or property." Zinermon v. Burch, 494 U.S. 113, 127 (1990) (emphasis in original). The Supreme Court has affirmed the need for a pre-deprivation hearing in myriad contexts. See Goldberg, 397 U.S. at 264 (hearing required prior to losing welfare benefits); Cleveland Bd. Of Educ. v. Loudermill, 470 U.S. 532, 542 (1985) (hearing required before termination of public employment); Parnham v. J.R., U.S. 442 U.S. 584, 606-607 (1979) (hearing required prior to confining a child in a mental hospital); Fuentes v. Shevin, 407 U.S. 67, 80-84 (1972); reh'g denied, 409 U.S. 902 (1972) (hearing required prior to issuance of writ allowing repossession of property); Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 18 (1970) (hearing required in advance of cutting off utility service).

The right to a hearing is not abrogated by the prisoner's status as a penal inmate. For example, in Wolff v. McDonnell, 418 U.S. 539, 557-566 (1974), the Supreme Court analogized deprivation of property rights to the deprivation of liberty and held that a hearing was required before the revocation of good time credit for satisfactory behavior while in prison. In that case, the Court held the inmate was entitled to written notice of charges against him, time to prepare his defense, a written statement by the fact-finders as to the evidence relied upon and reasons for the action taken, and the opportunity to call witnesses and present evidence. Id. at 565-6.

In the case at hand, Mr. Young (and the other inmates affected) should have been afforded a pre-deprivation hearing. Due process does not necessarily require a full scale hearing

of the issues at hand with all of the trappings of a criminal proceeding. Cleveland Bd. Of Educ. v. Loudermill, 470 U.S. 532, 545 (1985). However, at a minimum, Mr. Young should have received advance written notice of the RIDOC's decision to stop paying interest before interest was no longer distributed to the Inmate Accounts Funds. He also should have received an opportunity to present evidence and/or testimony regarding the potential policy change pre-deprivation and a written decision following his hearing. Because he did not receive even these minimal safeguards, the state violated his procedural due process rights.

## V. CONCLUSION

For the aforementioned reasons, Plaintiff, Edward Young, respectfully requests that this Court grant his motion for summary judgment.

EDWARD EUGENE YOUNG

By His Attorneys,

Andrew B. Prescott (#3758)
Stacie Boeniger Collier (#6059)
NIXON PEABODY, LLP
One Citizens Plaza, Suite 500
Providence, RI 02903
401-454-1000
401-454-1030 (Fax)

Date: September 9, 2005

**CERTIFICATION**

I hereby certify that a copy of the within Memorandum In Support of Plaintiff's Motion for Summary Judgment was sent by first class mail to Thomas A. Palombo, Esq., Assistant Attorney General, Department of the Attorney General, 150 South Main Street, Providence, RI 02903 on the 9th day of September, 2005.