UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| EDWARD EUGENE YOUNG<br><br>Plaintiff,<br>v.<br><br>A.T. WALL, in his capacity as the Director of the Rhode Island Department of Corrections<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | C.A. No. 03-220S |

**JOINT STATEMENT OF FACTS**

Now comes the parties in the above-captioned matter and submit this Joint Agreed Statement of Facts in support of their intended, respective motions for summary judgment.

1. Plaintiff Edward Eugene Young ("Plaintiff" or "Mr. Young") is a penal inmate at the Rhode Island Adult Correctional Institute ("ACI"). (Plaintiff's Second Am. Compl., June 1, 2005 at ¶ 4). In June of 2002, Mr. Young was incarcerated at The John J. Moran Medium Security Facility ("Moran"). (Deposition of Edward Eugene Young, July 14, 2005 . at p. 66). [1]

2. Mr. Young was convicted of child molestation, first degree sexual assault, in 1993. (Id. at p. 6). He is currently serving a forty five year sentence (twenty five years are suspended). (Id. at p. 5).

3. Defendant A.T. Wall ("Defendant" or "Wall") is the Director of the Rhode Island Department of Corrections ("RIDOC"). (Second Am. Compl. at ¶ 5).

4. Inmates are not allowed to retain money on their person. The RIDOC holds in trust all money earned or received by inmates while incarcerated. (Deposition of Richard J.

1 Hereinafter cited to as "Young Dep. Tr. at p. __." True and accurate copies of cited pages are attached hereto at Tab A.

Frechette, September 16, 2004 at p. 13).[2] The RIDOC maintains accounts for the deposit of inmate funds. The accounts are referred to collectively as the Inmate Accounts Fund. (Id. at pp. 13-4).

5. Money comes to an inmate at the ACI in various ways. An inmate can earn money through a job within the department or through work release. Relatives and friends can deposit money on the inmate's behalf. Inmates can also deposit other funds which come directly to them, like an inheritance or settlement. (Id.)

6. Rhode Island Law requires that twenty-five (25%) percent of an inmate's earnings up to a maximum of $500 be deposited into an account which is set aside for the inmate's use upon release. (Id. at p. 24). An inmate cannot spend the encumbered balance prior to his release other than as provided by in R.I. Gen. Laws § 42-56-22 (b). This account is sometimes referred to as the "frozen" or "closed" account. (Id. at p. 69; R.I. Gen. Laws § 42-56-22).

7. Inmates pay for certain services provided at the ACI, such as photocopying and medical co-pays, out of their inmate accounts. These expenses are electronically deducted. (Frechette Dep. Tr. at pp. 20-1).

8. R.I. Gen. Laws § 42-56-22, requiring creation of an encumbered fund, was enacted in 1976, and periodically amended thereafter. (Id. at p. 28).

9. Inmates also have a so-called "open" account, that inmates may use for commissary purchases, expenses, costs, etc., and from which they may transfer funds to commercial bank account in their names. RIDOC Policy 2.17-3 D.2 and 3.

10. It costs the RIDOC approximately $450,000 annually to administer the Office of Inmate Accounts. (Wall Aff. at ¶ 10).

---

2 Hereinafter cited to as "Frechette Dep. Tr. at p. __." True and accurate copies of cited pages are attached hereto at Tab B.

11. This office is devoted to management of the day to day activities of the Office of Inmate Accounts Fund and related matters. (Frechette Dep. Tr. at p. 10).

12. On June 7, 1999, Defendant repealed RIDOC Policy No. 2.17 and implemented in its place RIDOC Policy No. 2.17-1. (Id. at p. 45; Policy No. 2.17-1).

13. Under RIDOC Policy No. 2.17-1, interest earned on monies in the Inmate Accounts Fund would accrue to the depositing inmates in an equitable fashion. (Id.; Frechette Dep. Tr. at pp. 26-27).

14. On April 24, 2000, Defendant repealed RIDOC Policy No. 2.17-1 and implemented in its place RIDOC Policy No. 2.17-2. (Id. at p. 60; Policy No. 2.17-2).[3]

15. RIDOC Policy No. 2.17-2 stated that the return on investments earned on monies in the Inmate Accounts Fund would continue to accrue to the inmates in an equitable fashion. Pursuant to this policy, the RIDOC posted and distributed earnings (i.e., interest) to the inmates' individual accounts based upon their average daily balances. (Id.; Frechette Dep. Tr. at pp. 27, 62-3).

16. The RIDOC decided to switch vendors for its commissary and inmate accounts systems. The three respondents to its request for proposal indicated that their systems currently could not distribute interest earnings based on average daily balances, as had been RIDOC practice. (Id. at pp. 29-30).

17. This caused the RIDOC to examine whether it was required to distribute interest earnings to inmates. (Id. at p. 31).

---

[3] A true and accurate copy of RIDOC Policy No. 2.17-2 is attached hereto at Tab C.

18. The RIDOC decided to use any interest earned to pay for the cost of banking and related expenses instead of continuing to distribute the interest to the inmates. (Id. at p. 32; Policy 2.17-3).

19. THE RIDOC stopped posting interest to the Inmate Accounts Funds on June 1, 2002. This change in practice occurred in advance of a promulgation of the revised policy. (Frechette Dep. Tr. at p. 35). Richard J. Frechette, Associate Director of Financial Resources, posted a notice on or about June 20, 2002, announcing the change. (Id. at p. 40-41).[4]

20. Mr. Young read Mr. Frechette's June 20, 2002 posted memorandum regarding the change in practice on or about said date. (Young Dep. Tr. at p. 50, 59, 66).

21. In July of 2002, the RIDOC published Mr. Frechette's June 20, 2002 memorandum on page 4 of its John J. Moran Facility – Medium Security Newsletter. (Id. at p. 59).[5]

22. In a memorandum from Ann Fortin, Chief/Program Development Administration dated August 28, 2002, the RIDOC suspended the following provisions of the RIDOC Policy No. 2.17-2:

> II.D. Return of investment earned on monies in the Inmate Accounts Fund accrues to the depositing inmates in an equitable fashion.
>
> III.A.2. All inmate funds under the control of the RIDOC are kept in a custodial account with the Rhode Island General Treasurer. The Rhode Island General Treasurer prudently invests these funds. On a quarterly basis, the General Treasurer issues a return of investment on the custodial funds. The return of investment is distributed equitably to all inmate accounts that were active in the system on the day of the return of investment was posted via a computer program.
>
> (Frechette Dep. Tr. at pp. 61-62).[6]

---

4 A true and accurate copy of this posting is attached hereto at Tab D

5 A true and accurate copy of this memorandum is attached hereto at Tab E.

6 A true and accurate copy of Ms. Fortin's Memorandum dated August 28, 2002 is attached hereto at Tab F.

23. On or about August 14, 2002, Mr. Frechette sent inmates who made inquiries about the issue of interest payments a memorandum regarding the change of practice with respect to interest payments. At that time, Mr. Young read the memorandum. (Young Dep. Tr. at p. 61).[7]

24. Via memorandum dated May 6, 2003, Defendant repealed RIDOC Policy No. 2.17-2 and implemented in its place RIDOC Policy No. 2.17-3. RIDOC Policy No. 2.17-3 was to be effective June 9, 2003. (Frechette Dep. Tr. at pp. 52-3; Policy No. 2.17-3).[8]

25. RIDOC Policy No. 2.17-3 provided that interest earned in the Inmate Accounts Fund would no longer accrue to the inmates, but instead would accrue to the State of Rhode Island. (Id.; Frechette Dep. Tr. at p. 26).

26. Mr. Young retrieved RIDOC Policy No. 2.17-3 from the ACI's Law Library and read it. (Id. at 20). The other policies were also available at the Moran Law Library. (Id.).

27. Under Policy 2.17-3, Mr. Young has the right to put all or some of his open account funds in a commercial bank account that pays interest. (See Policy 2.17-3).

28. The RIDOC has an Inmate Grievance Policy in place. (RIDOC Inmate Grievance Policy 13.10)[9] Mr. Young is familiar with this Policy. (Young Dep. Tr. at p. 14).

29. Mr. Young opted not to file a grievance pursuant to the Inmate Grievance Policy regarding the Inmate Accounts Fund interest issue because he believed he had been retaliated against in the past for filing grievances. He had filed approximately six prior grievances during his incarceration. (Id.).

---

7 A true and accurate copy of this memorandum is attached hereto at Tab G.

8 True and accurate copies of Ms. Fortin's Memorandum dated May 6, 2003 and RIDOC Policy No. 2.17-3 are attached hereto at Tabs H and I respectively.

9 A true and accurate copy of the Inmate Grievance Procedure dated May 20, 1996 is attached hereto at Tab J.

30. Mr. Young did write letters to certain administrators regarding the interest issue. (Id. at p. 59).

31. On or about February 19, 2004 and March 19, 2004, Mr. Young sent letters to Lawrence C. Franklin Jr., State Controller, requesting information on inmate account interest. (Id. at p. 63).[10]

32. In a letter dated March 18, 2004, Mr. Franklin responded to Mr. Young's February 19, 2004 letter with answers to inquiries regarding the inmate account interest and providing documents. (Id. at pp. 63-64).[11]

33. Frechette sent an e-mail dated April 6, 2004 to Mr. Franklin to discuss Mr. Franklin's March 18, 2004 letter to Young. (A true and accurate copy of this e-mail is attached at Tab N).

34. Throughout his incarceration at the ACI, and subsequent to the suspension and permanent termination of the attribution of interest earnings on inmate accounts, Plaintiff had monies, including encumbered funds, in the Inmate Accounts Fund. (Young Dep. Tr. at p. 27).

35. Young has held numerous jobs throughout his incarceration. For example, he has worked at a porter. He has also worked in the laundry. He earned approximately $2.00 per day in each job. (Id. at pp. 30-31).

36. Individual inmates receive monthly statements of their deposits, withdrawals and other transactions in and out of their inmate accounts. (Frechette Dep. Tr. at p. 23).

37. The statements identify three balances for each inmate: his active balance, his encumbered balance and his debt. (Id.)

---

[10] True and accurate copies of Mr. Young's letters dated February 19, 2004 and March 19, 2004 are attached hereto at Tabs K and L respectively.

[11] A true and accurate copy of the Lawrence C. Franklin letter, dated March 18, 2004 is attached hereto at Tab M.

38. Young testified that he is owed approximately $500 in interest. (Young Dep. Tr. at p. 49).

EDWARD EUGENE YOUNG

By his Attorneys,

Andrew B. Prescott/SBC

Andrew B. Prescott (#3758)
Stacie Boeniger Collier (#6059)
NIXON PEABODY, LLP
One Citizens Plaza, Suite 500
Providence, RI 02903
401-454-1000
401-454-1030 (Fax)

A.T. WALL, Director
Rhode Island Department of Corrections

By his Attorney

PATRICK C. LYNCH
ATTORNEY GENERAL

Thomas A. Palombo (#4212)
Assistant Attorney General
150 South Main Street
Providence, RI 02903
401-274-4400 ext. 2296
401-222-2995 (Fax)